[Cite as *State ex rel. Montgomery v. Indus. Comm.*, 2013-Ohio-5295.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel.<br>Thomas J. Montgomery, | : | |
| | : | |
| Relator, | : | |
| | : | No. 12AP-759 |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio<br>and Advanced Composites, Inc., | : | |
| | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on December 3, 2013

*Larrimer and Larrimer,* and *Thomas L. Reitz,* for relator.

*Michael DeWine*, Attorney General, and *Eric J. Tarbox,* for respondent Industrial Commission of Ohio.

*Sebaly Shillito + Dyer, Karl R. Ulrich,* and *Danyelle S.T. Wright,* for respondent Advanced Composites, Inc.

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} Relator, Thomas J. Montgomery, commenced this original action requesting a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation beginning March 11, 2011 and to find that he is entitled to that compensation.

{¶ 2} Pursuant to Civ.R. 53(D) and Loc. R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate, who issued the appended decision, including findings of fact and conclusions of law. In his decision, the magistrate observed that the March 5, 2012 order of

the commission's staff hearing officer ("SHO") denies TTD on two separate grounds: (1) that relator is ineligible for the compensation because he voluntarily abandoned the workforce, and (2) that the C-84 of Dr. Ward is rejected as being unpersuasive based on Dr. Hawkins' opinion that the neurotic depression is not work prohibitive. The magistrate further observed that relator challenged the SHO's determination that he abandoned the workforce, but did not challenge the determination that the C-84 is rejected based on Dr. Hawkin's opinion.

{¶ 3} The magistrate recommends that we deny the writ of mandamus as the commission's determination that relator is ineligible for TTD compensation due to voluntary abandonment of the workforce is not ripe for judicial review in this action. Relator objects to this conclusion, arguing that the finding of voluntary abandonment is precedential and the request for TTD is continuing.

{¶ 4} Following an independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we overrule relator's objection and adopt the magistrate's decision as our own, including the findings of facts and conclusions of law contained in it. In accordance with the magistrate's decision, we deny the requested writ of mandamus.

*Objection overruled; writ denied.*

O'GRADY and T. BRYANT, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under the authority of Ohio Constitution, Article IV, Section 6(C).

————————

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

State of Ohio ex rel.                           :
Thomas J. Montgomery,

                                :

       Relator,

                                :                    No. 12AP-759

v.

                                :                (REGULAR CALENDAR)

Industrial Commission of Ohio
and Advanced Composites, Inc.,          :

       Respondents.                          :

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on June 20, 2013

---

*Larrimer and Larrimer,* and *Thomas L. Reitz,* for relator.

*Michael DeWine*, Attorney General, and *Eric J. Tarbox,* for respondent Industrial Commission of Ohio.

*Sebaly Shillito + Dyer, Karl R. Ulrich,* and *Danyelle S.T. Wright,* for respondent Advanced Composites, Inc.

---

### IN MANDAMUS

{¶ 5} In this original action, relator, Thomas J. Montgomery, requests a writ of mandamus ordering respondent Industrial Commission of

Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation beginning March 11, 2011 and to enter an order granting the compensation.

Findings of Fact:

{¶ 6} 1. On September 30, 2001, relator injured his right shoulder while employed as a machine operator for respondent Advanced Composites, Inc., a state-fund employer. On that date, relator fell several feet from the platform holding his machine.

2. The industrial claim is currently allowed for:

Contusion right shoulder; tear right rotator cuff; right synovitis; right bicipital tenosynovitis; right acromioclavicular joint arthritis; labral degeneration; right shoulder glenohumeral arthritis; degenerative joint disease right shoulder; right shoulder arthropathy; articular cartilage disorder right shoulder; neurotic depression.

{¶ 7} 3. On July 24, 2003, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), relator was examined by orthopedic surgeon E. Gregory Fisher, M.D. In his four-page narrative report dated July 29, 2003, Dr. Fisher stated:

The treatment that the injured worker has received to date has been reasonable, necessary and related to the allowed conditions of the claim. Unfortunately, the physical therapy has been canceled due to his cardiac condition and he may need to wait another few months to start physical therapy

I agree with the recommendations being made by the physician of record, that after clearance from his cardiologist, physical therapy should be done for at least two months.

* * *

I do not feel that the injured worker can return to his former position of employment due to the medical instability of his right shoulder and his cardiac problems at this point.

* * *

The claimant has not reached his maximum medical improvement and should have re-examination in approximately 3-4 months.

{¶ 8} 4. On December 10, 2003, at the bureau's request, relator was examined by Thomas N. Markham, M.D. In his four-page narrative report, Dr. Markham states:

This injured worker has not reached MMI for the injury to his right shoulder. He has most recently started physical therapy to improve the strength and range of motion. This start of physical therapy was delayed due to unrelated medical conditions which themselves limit his ability to return to work. He has a significantly reduced left ventricular discharge and recovering congestive heart failure. As a result of this latter condition, he may require vocational rehabilitation. A skills assessment is recommended.

* * *

The injured worker cannot return to his former position of employment at present. Although his right shoulder has not reached MMI, his employment limitations have been caused by the unrelated medical conditions. He could return to work which did not require more than light manual labor with the right arm. This return to work is dependent upon the control of his cardiac health condition.

{¶ 9} 5. On March 2, 2004, at the bureau's request, relator was examined by Donald J. Sherman, M.D. In his five-page narrative report, Dr. Sherman stated:

The injured worker remains substantially symptomatic and impaired, but there is indication of improvement with physical therapy. I do not consider that the injured worker has reached maximum medical improvement. If he is not medically prevented from continuing physical therapy, he may derive further benefit. If, however, he participates in physical therapy for another eight to ten weeks, with no interruptions or limitations imposed by his cardiac condition, and if there were no substantial improvement by that time, I would then consider him to have reached maximum medical improvement.

* * *

I discussed Mr. Montgomery's condition with his treating physician, Dr. Travis. We talked about vocational rehabilitation, which will be discussed below. In my opinion, treatment to date has been both necessary and appropriate.

* * *

It is my opinion, and also that of Dr. Travis, that if Mr. Montgomery cannot participate in meaningful vocational rehabilitation because of his cardiac condition, it is unlikely that he would be able to resume gainful physical work for which he is otherwise qualified by virtue of education, training, and experience.

* * *

The injured worker is not able to return to his former position of employment.

{¶ 10} 6. Following a June 29, 2004 hearing, a staff hearing officer ("SHO") issued an order stating:

Temporary total disability is denied from 03/17/2004 to the present, 06/29/2004. Based on the reports of Drs. Markham, Sherman and Fishinger [sic], the injured worker cannot work presently due to the injured worker's unrelated cardiac problems.

{¶ 11} 7. On July 23, 2004, at the bureau's request, relator was examined by Stephen W. Duritsch, M.D. In his three-page narrative report, Dr. Duritsch stated:

The injured worker states that he has noted a great deal of improvement in his shoulder over the last several months[.] He states that from a medical standpoint he has been able to participate in therapy[.] Due to the stability of his medical problems he was not medically suited for therapy through a good portion of the last of 2003 and early 2004[.] He states that he feels stronger and his motion is better in the right shoulder[.] He still has some weakness with external rotation and overhead lifting[.] His symptoms are still a 5 on a 1 to 10 scale[.] His symptoms are worse with heavy exercise and better with rest[.] Functionally he has returned to driving and doing housework[.] He is unable to swing tools so it is difficult for him to do yard work[.] He had to change his hobbies as he can no longer handle a high-powered rifle[.]

From a medical standpoint his internist, Dr. Olegario at Good Samaritan Hospital in Cincinnati, told him that he is disabled[.] Social Security Disability has been processed[.] The injured worker does not plan to return to work once his therapy is completed[.]

* * *

The injured worker had a fall in 2001[.] He had his first surgical procedure in March of 2002 and needed a redo procedure in December of 2002[.] His postoperative rehabilitation has been complicated by medical conditions including congestive heart failure and irritable bowel syndrome[.] He states that his medical condition is unrelated to this claim and have been severe enough that he is not going to go back to work for those conditions alone[.] He is on Social Security Disability[.] The primarily [sic] issue here is how long to continue physical therapy for strengthening, as the original plan for reconditioning with return to work is no longer appropriate as this injured worker is not planning to return to work[.]

* * *

This injured worker likely warrants another four weeks of physical therapy at three times a week[.] He likely will be at maximal medical improvement at the completion of those visits[.]

* * *

He cannot return to his former position of employment due to medical conditions of congestive heart failure and chronic obstructive pulmonary disease[.] He does not plan to go back to his previous job[.]

* * *

Based on the information available at this time and my examination today, I completed the Opinion of Physical Capacities form based only on his shoulder injury from 2001[.] This injured worker will be capable of light duty work based on his shoulder injury alone[.] His other medical conditions, per his report today, are preventing him from going back to work[.]

{¶ 12} 8. On March 11, 2011, at relator's own request, he was examined by clinical psychologist H. Owen Ward, Jr., Ph.D. In his five-page narrative report, Dr. Ward opined:

CONCLUSIONS AND RECOMMENDATIONS

Based upon the current data presented to me I have given Mr. Montgomery the following diagnosis for a work related condition based on ICD-9-CM criteria:

300.4 Neurotic Depression.

The causality seems clear in this case. Mr. Montgomery has suffered from chronic depression over the past 4 to 5 years that are generally mild to moderate with very brief periods of relief. While he did appear to have some adjustment problems with his alcoholic ex-wife, these symptoms were episodic and seemed to have abated once he divorced. His irritability and verbal assaultive tendencies appear to be related to his depression and coping difficulty with chronic pain. In this regard, some of his anxiety appears to be related to this process of internalizing anger.

In terms of causality, I believe that the current data indicates clearly that his current condition is the direct and proximate result of his workplace injury. These symptoms seem to have their onset for the era following his surgery in 2003, when his physical condition worsened and his pain became increasingly debilitating.

I have discussed with Mr. Montgomery the recommendation for psychotherapy and psychotropic medication. He seems to be a cooperative person and willing to engage in treatment if he is granted benefits through the BWC.

{¶ 13} 9. On September 30, 2011, at the bureau's request, relator was examined by psychiatrist and neurologist James R. Hawkins, M.D. In his nine-page narrative report dated October 18, 2011, Dr. Hawkins answers seven questions:

OPINION- The following opinions are based on the information obtained from the history, present complaints, mental status examination, review of medical records provided, and are to a reasonable degree of medical certainty.

[One] Do the submitted medical evidence and the examination findings support the existence of the requested condition according to DSM IV classifications?

Medical evidence and examination findings support a diagnosis of a mild chronic depression best described as 300.4 Neurotic Depression. He feels sad, somewhat hopeless, and is concerned about his future. Nevertheless, he retains nearly all of his functional abilities.

[Two] What is the normal onset of this type of diagnosis?

Typically, this illness occurs with multiple losses over a long period of time. Mr. Montgomery has multiple medical illnesses which are impairing his ability to function to his premorbid level.

[Three] What is the normal recovery period for this condition(s)?

Dysthymia, is a chronic illness from which recovery is not likely.

[Four] Is/are the alleged condition(s) a direct and proximate result of the industrial injury?

No, the Dysthymic pre-existed the industrial injury.

[Five] If the condition was present prior to the injury, did the injury aggravate the psychological condition?

The injury did aggravate his pre-existing condition of Neurotic Depression.

[Six] If, in your opinion, the psychological condition is present, what should current and future treatment include? Please indicate frequency and duration.

Mr. Montgomery might benefit from a mild antidepressant and supportive counseling however there will be no long-term benefits given the chronicity of his depressive illness. I would recommend no more than 6 months of treatment.

[Seven] Is this work prohibitive?

The depression is not work prohibitive.

{¶ 14} 10. On October 25, 2011, the bureau mailed an order additionally allowing the claim for "neurotic depression," based upon Dr. Hawkins September 30, 2011 examination and report.

{¶ 15} 11. On November 11, 2011, Dr. Ward completed a C-84 on which he certified TTD from March 11, 2011 to an estimated return-to-work date of February 3, 2012. Dr. Ward's certification was exclusively based upon the neurotic depression.

{¶ 16} 12. On November 18, 2011, relator moved for TTD compensation beginning March 3, 2011 based upon the C-84 from Dr. Ward.

{¶ 17} 13. Following a January 10, 2012 hearing, a district hearing officer ("DHO") issued an order denying the C-84 request for TTD compensation. The DHO's order explains:

The District Hearing Officer finds the Injured Worker voluntarily abandoned the work force. From the Injured Worker's testimony and the Bureau of Worker's Compensation CSS notes dated 11/23/2011 and 12/02/2011, the District Hearing Officer finds the Injured Worker has not worked since 03/07/2002. At hearing, the Injured Worker acknowledged that he has not worked since this date. [H]e is currently receiving Social Security benefits, and since 03/07/2002, has made no effort [to] obtain employment. Therefore, based upon this District Hearing Officer's finding that the Injured Worker voluntarily abandoned the workforce, the District Hearing Officer does not find the Injured Worker eligible for payment of temporary total disability compensation.

{¶ 18} 14. Relator administratively appealed the DHO's order of January 10, 2012.

{¶ 19} 15. On March 2, 2012, relator executed an affidavit stating:

Now comes the affiant after first being dually cautioned and sworn and states that the following is a statement regarding my inability to continue working and the facts associated with my termination in 2003. I am making this statement in reference to the hearing officer's recent determination that I allegedly voluntarily abandoned the work force. This fact could not be further from the truth.

At the time of my injury, I was working 40-50 hours per week. Directly following the injury I was not able to work

overtime but tried my best to continue light duty employment. Prior to my employment with Color and Composite Technologies, I was employed at Copeland Corporation working in full time capacity 40+ hours.

When my injury first occurred, it was only recognized for contusion. Shortly thereafter, an MRI did confirm a tear of the right rotator cuff. This condition was eventually recognized in my claim and I began receiving temporary total disability benefits on March 15, 2002, the date of my first shoulder surgery. Following my surgery, I participated in vocational rehabilitation with the Bureau of Workers' Compensation and received living maintenance benefits. At the same time I was involved with vocational rehabilitation, I also was undergoing extensive physical therapy without much improvement. Unfortunately, my vocational rehabilitation plan had to be closed due to my inability to reach the physical capacity that would allow me to be productive with my employer of record. I was told that my vocational rehabilitation file was closed due to medical instability effective November 4, 2002.

As my complaints continued, I did seek consultation for additional surgery. There was a delay in obtaining approval for my surgery as my EKG testing need[ed] to be cleared. It was determined that I needed additional surgery and my employer was growing very impatient about my ability to return to work. In fact, the human resources department continued to question me about the situation "not moving along." I did undergo my second shoulder surgery in December of 2002, and unfortunately, was told by the employer that I was terminated effective March 31, 2003, as a result of my inability to return to work. This is despite the fact that the BWC physician's continued to note my ongoing disability associated with my shoulder injury.

I again availed myself of vocational rehabilitation but again the case was closed due to medical instability on July 1, 2003.

On a fourth occasion, I again referred myself to vocational rehabilitation in 2004 however, by this time I was diagnosed with congestive heart failure in addition to the problems I was having with my shoulder. I was not able to participate in the vocational rehabilitation due to this and was forced to make a determination to file for social security disability.

My decision to file for social security disability was due to the fact that I had many medical bills to pay and no health insurance due to my termination. Clearly, it was my intention to return to work if I had the ability to do so. My shoulder condition has never resolved and has continued to weaken to this day. I have had several consultations with various physicians including one at the Cleveland Clinic who have told me a third surgery would not be beneficial.

I am offended by the allegation that I somehow voluntarily abandoned the work force in 2002, when the truth clearly is documented in the medical evidence and rehabilitation records.

Even after my cardiac condition became stable, I continued to try to find a resolution to my shoulder problem and actually consulted with the Orthopedic Institute as well as the Cleveland Clinic.

My shoulder to this day is seriously weak. I have to use my left arm to assist it with many tasks. Pain causes me difficulty sleeping and has contributed to my frustration with performing daily activities. I do believe that the pain and the disability associated with my shoulder condition have led to the recent diagnosis of neurotic depression.

I have never had a resolution of my right shoulder condition since my date of injury and would wish nothing better than to have the ability to return to work. I would ask hat the Industrial Commission please consider my statement in regard to fully evaluating the reason for my departure from work in 2003.

{¶ 20} 16. Following a March 5, 2012 hearing, an SHO issued an order affirming the January 10, 2012 order of the DHO and denying the C-84 request for TTD compensation. The SHO's order explains:

The Injured Worker's C-86 motion, filed 11/18/2011, requests the payment of temporary total disability compensation for the period from 03/03/2011 through 11/18/2011 and continuing. However, at the hearing of Monday, March 5, 2012, the Injured Worker's legal counsel modified that request and stated that the Injured Worker is only requesting temporary total disability compensation from 03/11/2011 through an estimated date of 05/02/2012 and continuing. The change in the starting date of temporary total disability compensation was based on the fact that the

Injured Worker was first examined by Hensel Owen Ward, Jr, Ph.D., on 03/11/2011, not 03/03/2011.

The Administrator of the Bureau of Workers' Compensation objected to said request, based, in part, upon the allegation that the Injured Worker has abandoned the workforce.

The Injured Worker submitted an affidavit, dated 03/02/2012, stating that the allegation that he voluntarily abandoned the workforce was not true. However, this Staff Hearing Officer does not find the Injured Worker's affidavit to be credible nor persuasive.

This Staff Hearing Officer makes note of the fact that, when the Injured Worker was previously examined by Donald J. Sherman, M.D., an Occupational Medicine Specialist, on 03/02/2004, the Injured Worker told the examining physician that, "he has been diagnosed with chronic obstructive pulmonary disease...irritable bowel syndrome and congestive heart failure." Furthermore, Dr. Sherman indicates that the Injured Worker told him that, "the Injured Worker believes he will not be able to resume gainful employment, because of his cardiac condition, and is intent on pursuing permanent total disability." Dr. Sherman then contacted the Injured Worker's attending physician, R. Daniel Travis, M.D. Dr. Sherman related that, "I discussed Mr. Montgomery's condition with his treating physician, Dr. Travis. We talked about vocational rehabilitation, which will be discussed below...it is my opinion, and also that of Dr. Travis, that if Mr. Montgomery cannot participate in meaningful vocational rehabilitation, because of the cardiac condition, it is unlikely that he would be able to resume gainful physical work for which he is otherwise qualified by virtue of education, training, and experience."

The Injured Worker was next examined [by] a Physical Medicine and Rehabilitation Specialist, Stephen W. Duritsch, M.D., on 07/23/2004. The Injured Worker related a similar history to Dr. Duritsch and stated that he had other, non-industrial illnesses, including Histoplasmosis, Chronic Obstructive Pulmonary Disease, Congestive Heart Failure and Irritable Bowel Syndrome. Furthermore, the Injured Worker told Dr. Duritsch that, "From a medical standpoint, his Internist, Dr. Olegarrio, at Good Samaritan Hospital, in Cincinnati, told him that he is disabled. Social Security Disability has been processed. The Injured Worker does not plan to return to work, once his therapy is completed." Furthermore, Dr. Duritsch also stated that Injured

[W]orker's, "post-operative rehabilitation has been complicated by medical conditions, including congestive heart failure and irritable bowel syndrome. He states that his medical condition is unrelated to this claim and have been severe enough that he is not going to go back to work for those conditions alone...the original plan for reconditioning, with return to work, is no longer appropriate, as this Injured Worker is not planning to return to work." Dr. Duritsch then stated his professional medical opinion that, "He cannot return to his former position of employment, due to medical conditions of congestive heart failure and chronic obstructive pulmonary disease. He does not plan to go back to his previous job...This Injured Worker will be capable of light duty work, based on his shoulder injury alone. His other medical conditions, per his report today, are preventing him from going back to work."

Furthermore, this Staff Hearing Officer makes note of the fact that the Injured Worker's affidavit, dated 03/02/2012, stated that he attempted to participate in vocational rehabilitation, on four different occasions, and went on to state that, "Clearly, it was my intention to return to work, if I had the ability to do so."

However, the vocational rehabilitation closure letter of 01/27/2004, specifically stated that, "Mr. Montgomery is not interested in pursuing vocational rehabilitation services. He is currently receiving just over $500.00 in Social Security payments due to his heart condition and Irritable Bowel Syndrome...Mr. Montgomery has been referred for vocational rehabilitation services, due to his work-related injury on September 30, 2001. OEHP is the MCO responsible for managing Mr. Montgomery's Workers' Compensation claim. Mr. Montgomery indicated that his doctor does not believe that he is capable of sustained remunerative employment, due to his heart condition. Consequently, Mr. Montgomery denied services due to his heart condition and consequently Mr. Montgomery denied services" (emphasis added).

Therefore, it is the finding of this Staff Hearing Officer that the Injured Worker voluntarily abandoned the entire labor market, "due to medical conditions of congestive heart failure and chronic obstructive pulmonary disease" which are conditions unrelated to the incident claim. Therefore, it is the finding of this Staff Hearing Officer that the Supreme Court's Holding in the case of State ex rel. Lackey v. Indus. Comm. (2011), 129 Ohio St.3d 119, is applicable to the facts

in the instant claim. The Injured Worker did not demonstrate, through medical evidence at the time of his departure from the workforce, that said departure was causally related to the industrial injury, as opposed to his non-industrial conditions of congestive heart failure and chronic obstructive pulmonary disease.

The Ohio Supreme Court has also held that eligibility for compensation, under these circumstances, depends on whether the separation from appointment was "injury-induced". In the instant claim, the Injured Worker sought Social Security Disability not because of his right shoulder injury, but due to his cardiac condition. The Industrial Commission has previously held, in this claim, in an order dated 06/29/2004, published 07/01/2004, that, "Based on the reports of Dr. Markham, Sherman and Fishinger [sic], the Injured Worker cannot work, presently, due to the Injured Worker's unrelated cardiac problems." Therefore, at that time, temporary total disability compensation was denied, from 03/17/2004 forward.

It is the finding of this Staff Hearing Officer that the Injured Worker, himself, has foreclosed the possibility of finding and obtaining other employment, as he abandoned the entire workforce. Therefore, payment of temporary total disability compensation is barred pursuant to the Ohio Supreme Court's holding in the case of State ex rel. Ashcraft v. Indus. Comm. (1987), 34 Ohio St.3d 42. In that case, the Court stated that, when a Injured Worker voluntarily exits the entire market, "He no longer incurs a loss of earnings, because he is no longer in a position to return to work." Ashcraft at page 44.

Furthermore, assuming, arguendo, that the Injured Worker had not voluntarily abandoned the workforce, this Staff Hearing Officer makes note of the fact that the requested period of disability is based upon the newly allowed condition of neurotic depression, which was additionally allowed in this claim pursuant to the Administrator's order of 10/25/2011. That order specifically stated that, "This claim is additionally allowed for the medical condition of 300.4 neurotic depression" and that, "This decision is based on: Dr. Hawkins examine of 09/30/2011."

The Administrator's order refers to the narrative report of James R. Hawkins, M.D., a Board-Certified Psychiatrist and Neurologist, who examined the Injured Worker on 09/30/2011, at the request of the Bureau of Workers'

Compensation. Dr. Hawkins confirmed that the, "medical evidence and examination findings support a diagnosis of a mild chronic depression, best described as 300.4 neurotic depression...The Injury did aggravated his pre-existing condition of neurotic depression". However, in regard to the issue of whether or not the Injured Worker's neurotic depression was "work prohibitive", Dr. Hawkins specifically stated his professional medical opinion that the Injured Worker's, "depression is not work prohibitive."

This Staff Hearing Officer also finds the opinion of James R. Hawkins, M.D., to be persuasive. Therefore, it is the finding of this Staff Hearing Officer that the Injured Worker's neurotic depression is not work [prohibitive].

Therefore, it is the **order** of this Staff Hearing Officer that **the requested period of temporary total disability compensation, from 03/11/2011 through 03/05/2012, is hereby DENIED**.

(Emphasis sic.)

{¶ 21} 17. On April 3, 2012, another SHO mailed an order refusing relator's appeal from the SHO's order of March 5, 2012.

{¶ 22} 18. On September 4, 2012, relator, Thomas J. Montgomery, filed this mandamus action.

Conclusions of Law:

{¶ 23} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

{¶ 24} Analysis begins with the observation that the SHO's order of March 5, 2012 denies TTD compensation on two separate grounds: (1) that relator is ineligible for the compensation because he voluntarily abandoned the workforce, and (2) that the C-84 of Dr. Ward is rejected as being unpersuasive based upon Dr. Hawkins' opinion that the neurotic depression is not work prohibitive.

{¶ 25} An injured worker who has voluntarily abandoned the entire workforce for reasons unrelated to his industrial injury is ineligible for TTD compensation. *State ex rel. Pierron v. Indus. Comm.*, 120 Ohio St.3d 40, 2008-Ohio-5245.

{¶ 26} Of course, an injured worker who is eligible for TTD compensation has the burden "to pursuade the commission that there is a proximate causal relationship between his work-connected injuries and disability, and to produce medical evidence to this effect." *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78, 83 (1997)

{¶ 27} Here, quoting from the numerous medical reports of record regarding relator's non-allowed medical conditions that have restricted his ability to work and participate in rehabilitation of his shoulder injury, the SHO's order of March 5, 2012 presents a lengthy explanation as to why the SHO found that relator voluntarily abandoned the workforce. It is that explanation of ineligibility that relator challenges in this action.

{¶ 28} But the SHO's order of March 5, 2012 also presents an alternative basis for denial of the compensation requested:

Furthermore, assuming, arguendo, that the Injured Worker had not voluntarily abandoned the workforce, this Staff Hearing Officer makes note of the fact that the requested period of disability is based upon the newly allowed condition of neurotic depression, which was additionally allowed in this claim pursuant to the Administrator's order of 10/25/2011. That order specifically stated that, "This claim is additionally allowed for the medical condition of 300.4 neurotic depression" and that, "This decision is based on: Dr. Hawkins examine of 09/30/2011."

The Administrator's order refers to the narrative report of James R. Hawkins, M.D., a Board-Certified Psychiatrist and Neurologist, who examined the Injured Worker on 09/30/2011, at the request of the Bureau of Workers' Compensation. Dr. Hawkins confirmed that the, "medical evidence and examination findings support a diagnosis of a mild chronic depression, best described as 300.4 neurotic depression...The Injury did aggravate his pre-existing condition of neurotic depression". However, in regard to the issue of whether or not the Injured Worker's neurotic depression was "work prohibitive", Dr. Hawkins specifically stated his professional medical opinion that the Injured Worker's, "depression is not work prohibitive."

This Staff Hearing Officer also finds the opinion of James R. Hawkins, M.D., to be persuasive. Therefore, it is the finding

of this Staff Hearing Officer that the Injured Worker's neurotic depression is not work [prohibitive].

{¶ 29} Relator does not challenge here the alternative basis for denial of the compensation request. That is, relator does not argue that the report of Dr. Hawkins fails to constitute some evidence supporting denial of the C-84 request for TTD compensation.

{¶ 30} Thus, even if this court were to determine that the commission abused its discretion in finding a voluntary abandonment of the workforce, Dr. Hawkin's report remains as some evidence supporting denial of the compensation.

{¶ 31} Under the circumstances, a writ of mandamus must not issue.

{¶ 32} The commission's determination that relator is ineligible for TTD compensation due to a voluntary abandonment of the workforce is not ripe for judicial review in this action.

{¶ 33} *State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 82 Ohio St.3d 88, 89 (1998), is instructive. In that case, the Supreme Court of Ohio applied the ripeness doctrine in a mandamus action brought by an employer who challenged the claimant's entitlement to workers' compensation. The *Elyria* court denied the requested writ on grounds that the question presented was not ripe for review. The *Elyria* court states:

The ripeness doctrine is motivated in part by the desire "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies * * *." *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691. As one writer has observed:

"The basic principle of ripeness may be derived from the conclusion that 'judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical or remote.' * * * [T]he prerequisite of ripeness is a limitation on jurisdiction that is nevertheless basically optimistic as regards the prospects of a day in court: the time for judicial relief is simply not yet arrived, even though the alleged action of the defendant foretells legal injury to the plaintiff." Comment, Mootness and Ripeness: The Postman Always Rings Twice (1965), 65 Colum.L.Rev. 867, 876.

{¶ 34} Here, relator is asking this court to issue a writ ordering the commission to vacate one of the two grounds the commission gave for denial of compensation. As noted, that ground is the determination of ineligibility due to a voluntary workforce abandonment. But a court ordered elimination of the commission's ineligibility determination cannot result in an award of compensation under the circumstances here.

{¶ 35} Conceivably, the instant determination of ineligibility could come into play if relator were to make a further request for TTD compensation. In the event that such a scenario develops in the future, it is conceivable that the finding of a voluntary abandonment of the workforce would be ripe for judicial review.

{¶ 36} For now, it is the magistrate's view that the commission's eligibility determination is not ripe for review in this action. *See State ex rel. Park Poultry, Inc. v. Indus. Comm.*, 10th Dist. No. 03AP-1122, 2004-Ohio-6831. *State ex rel. YRC, Inc. v. Hood,* 10th Dist. No. 09AP-529, 2010-Ohio-2190.

{¶ 37} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.


/S/ MAGISTRATE
KENNETH W. MACKE


**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).